# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MEDIA BANK, LLC               )

                                  )

       Plaintiff/Counter-Defendant,    )

                                  )    Case No. 19 CV 2465

    v.                               )

                                  )    Judge John J. Tharp

SCOTTeVEST, INC.,             )

                                  )    Magistrate Judge Finnegan

       Defendant/Counter-Plaintiff.    )

## ANSWER AND COUNTERCLAIM

Defendant/Counter-Plaintiff, SCOTTeVEST, Inc. ("SCOTTeVEST") by and through its attorneys, Elvis Gonzalez, Ltd., for its Answer and Counterclaim to the Complaint of Plaintiff/Counter-Defendant, Media Bank, LLC ("MBuy"), alleges as follows:

### THE PARTIES

1.     Media Bank, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Chicago, Illinois. At all relevant times, Media Bank, LLC conducted business as "MBuy" (hereinafter, "MBuy").

**ANSWER:**

SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the allegations in Paragraph 1.

2.     MBuy is engaged in the business of media planning and purchasing. MBuy works with its clients, prospective advertisers, to plan, evaluate and optimize media purchases across the spectrum of platforms and channels, including television, radio, print, digital and social media.

**ANSWER:**

SCOTTeVEST admits the allegations in Paragraph 2, and affirmatively avers that MBuy describes itself to clients as combining proprietary technology, in-house experts, and data-driven methods in the performance of the services described in Paragraph 2.

3. Defendant is a corporation [sic] limited liability company organized under the laws of the State of Idaho, with its headquarters located in Ketchum, Idaho.

**ANSWER:**

SCOTTeVEST denies that it is a limited liability company, but admits the remaining allegations in Paragraph 3.

4. Defendant is engaged in the business of marketing and selling "SCOTTeVEST" branded outerwear and garments that feature a series of pockets designed to hold an array of electronic devices and other gadgets. "SCOTTeVEST" branded outerwear and garments are sold through retail resellers, as well as through Defendant's own website (https://www.scottevest.com/).

**ANSWER:**

SCOTTeVEST admits the allegations in Paragraph 4, but affirmatively avers that it primarily sells its products through its own website and Amazon.

**JURISDICTION AND VENUE**

5. Media Bank, LLC's sole member is MediaOcean, LLC, a Delaware limited liability company with its principal place of business in New York. MediaOcean's sole member is a New York corporation also headquartered in New York.

**ANSWER:**

SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the allegations in Paragraph 5.

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because of the diversity of citizenship between the parties (Media Bank, LLC is deemed a resident of Delaware, Illinois and New York, while Defendant is deemed a resident of Idaho), and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

**ANSWER:**

Defendant admits that Illinois has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a).

7.     Venue is appropriate in this district pursuant to 28 U.S.C. §1391 pursuant to the terms of an express written agreement between the parties.  Moreover, Defendant regularly does business in Illinois, is registered to do business in Illinois, and a substantial part of the events giving rise to the claim occurred within this judicial district.

**ANSWER:**

Defendant admits that venue is appropriate in this District under 28 U.S.C. §1391.

**FACTS COMMON TO ALL COURTS**

8.     In or about June 2018, Defendant engaged MBuy to assist it with the planning and purchase of media for what, at the time, was projected to be a multi-million-dollar nationwide advertising campaign.

**ANSWER:**

SCOTTeVEST admits the allegation in Paragraph 8, and affirmatively avers it also engaged MBuy to analyze, evaluate, and manage its past and future media purchases, and to provide it with access to MBuy's proprietary technology to permit real-time reporting and analysis of media spending and daily adjustments as necessary to optimize its advertising spending.

9.      On June 4, 2018, the parties executed an "MBuy Authorization" (a form that has since been renamed a "Mutual Business Agreement") to clearly establish the roles and responsibilities of the parties involved in the planning, negotiation, and purchasing of media inventory."  A true and correct copy of the MBuy Authorization is submitted herewith as Exhibit A.

**ANSWER:**

SCOTTeVEST admits the allegations in Paragraph 9, but affirmatively avers the parties intended to attach a SCOTTeVEST Marketing/Creative Agency Scope of Work to their contractual documents, but failed to do so by mutual mistake because the MBuy Authorization was executed and exchanged electronically.

10.      The MBuy Authorization was executed on behalf of Defendant by Marshall Rule, its President at the time.

**ANSWER:**

SCOTTeVEST admits the allegation in Paragraph 10.

11.      Among other things, the executed MBuy Authorization reflects the parties [sic] mutual understanding regarding certain basic terms of the engagement:

    a.      the initial term (6/4/18 – 12/31/18);

    b.      the general services that MBuy would be providing to Defendant;

    c.      the fees that would be charged by MBuy (based upon percentages of the purchases of varying types of media), and the Defendant's obligation to pay those fees; and

    d.      an approximation and allocation of the Defendant's planned media purchases during the term.

**ANSWER:**

SCOTTeVEST admits the allegations in subparagraphs "a," "b," and "c,"  but denies

the allegation in subparagraph "d" insofar as MBuy was also required it to evaluate, manage, and adjust SCOTTeVEST's allocation of media purchases on a daily basis across all platforms for the purpose of optimizing its advertising spending.

12.     The MBuy Authorization also expressly advised that the "next step" would be the execution of an "Insertion Order," containing the details surrounding a proposed advertising spend, and expressly requesting authorization for specific media purchases.

**ANSWER:**

SCOTTeVEST admits the allegation in Paragraph 12.

13.     Pursuant to the MBuy Authorization, MBuy prepared and presented Defendant with two separate Insertion Orders, the first in August 2018 and the second in December 2018. A true and correct copy of the 2018 Insertion Orders are submitted herewith as Group Exhibit B.

**ANSWER:**

SCOTTeVEST admits the allegation in Paragraph 13.

14.     The August 2018 Insertion Order specifically sought authorization from Defendant for various media purchases to "run" from September 1, 2018 on December 21, 2018.

**ANSWER:**

Defendant admits to the allegation in Paragraph 14, but affirmatively avers the parties intended to monitor and adjust the allocation of the media purchased on a daily basis in order to optimize SCOTTeVEST's media spending.

15.     The December 2018 Insertion Order specifically sought authorization from Defendant for a media purchase from December 14-31, 2018.

**ANSWER:**

SCOTTeVEST admits the allegation in Paragraph 15, but affirmatively avers the parties intended to monitor and adjust the allocation of the media purchased on a daily basis in order to

optimize SCOTTeVEST's media spending.

16.    Notably, each of the Insert Orders contain the following terms:

**INSERTION ORDER TERMS**

<u>General Placement Guidelines & Limitations of Liability</u>
MBuy is not responsible for incorrect ad materials run when ad materials or instructions are not received by the ad material deadline. MBuy does not make corrections to ad creative. All ad creative must be submitted in final format. MBuy will not be held responsible for incorrect and/or invalid creative materials that are submitted from a previous placement. ***This agreement, along with the mutually signed Mutual Business Agreement and terms and conditions at*** ***www.mbuy.com/tc, which are incorporated by reference, contain the entire agreement of the parties and supersedes all prior discussions, agreements and undertakings between the parties with respect to the subject matter hereof; this Insertion Order supersedes inconsistent terms in the terms and conditions.***

\*                \*                \*                \*

<u>Payment Terms</u>
Payment to MBuy must be received by the payment terms selected below. In the event Advertiser and/or Advertiser Agency (collectively, "Advertiser-Purchaser"), as the case may be, fails to make payment, MBuy may discontinue all Ads until payment is received in full. A completed and signed Insertion Order constitutes a binding agreement between Advertiser-Purchaser and MBuy and shall guarantee advertising rates for the period identified in this document. Upon execution of the media buy between MBuy and the media vendor(s)/Publisher, MBuy has fully performed its obligation to purchase media on behalf of the customer. ***By signing the Agreement the Advertiser-Purchaser agrees to all conditions stated in this Insertion Order, as well as the terms and conditions available at*** ***www.mbuy.com/tc*** ***(the "TC").*** The Advertiser-Purchaser acknowledges and understands: (i) MBuy will not and shall not be required to make any payments on behalf of the Advertiser-Purchaser until MBuy receives all funds payable and/or due to it and (ii) fees owed to MBuy directly will be paid first and the remainder of the funds will be used to make payments on behalf of the Advertiser-Purchaser for the media costs. All capitalized terms used in this Insertion Order and not otherwise defined herein shall have the meaning ascribed to them in the TC.

<u>Agreement to Terms</u>
***The signature & date below constitutes acceptance of the terms of this Insertion Order and the individual signing represents and warrants that he/she has authority to sign this Insertion Order on behalf of the above listed Advertiser and, if applicable, the Advertiser-Agency.***

Group Exhibit B, page 2 of 3 (emphasis added).

**ANSWER:**

SCOTTeVEST admits the allegations in Paragraph 6.

17.     The complete "terms and conditions" incorporated by reference into the Insertion Orders were at all times available to SCOTTeVEST.  A true and correct copy of the terms and conditions as they appeared at the time at www.mbuy.com/tc is submitted herewith as Exhibit C.

**ANSWER:**

SCOTTeVEST admits that certain "terms and conditions" appeared at www.mbuy.com/tc, which was available to it.  SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the remaining allegations in Paragraph 17 becaues it does not know whether Exhibit C represents the "terms and conditions" as they existed at the time the Insertion Orders were each executed.

18.     On information and belief, Defendant reviewed the terms and conditions at www.mbuy.com/tc prior to executing the 2018 Insertion Orders.

**ANSWER:**

SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the allegations in Paragraph 18 because the individual executing the Insertion Orders on its behalf is no longer within its employ.

19.     Both of the 2018 Insertion Orders were executed by Marshall Rule on behalf of the Defendant in his capacity as its President.

**ANSWER:**

SCOTTeVEST admits the allegation in Paragraph 19.

20.     The total media purchase authorized by the Defendant in connection with the August 2018 Insertion Order was $815,000.

**ANSWER:**

SCOTTeVEST admits the allegation in Paragraph 20, but affirmatively avers the parties intended to monitor and adjust the allocation of the media purchased on a daily basis in order to optimize SCOTTeVEST's media spending.

21.      MBuy executed all of the authorized purchases identified in the August 2018 Insertion Order, all of which ran as contemplated.

**ANSWER:**

SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the allegations in Paragraph 21.

22.      The media purchase authorized by the Defendant in connection with the December 2018 Insertion Order was $15,000.

**ANSWER:**

SCOTTeVEST admits the allegation in Paragraph 22.

23.      MBuy executed the authorized purchases identified in the December 2018 Insertion Order, all of which ran as contemplated.

**ANSWER:**

SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the allegations in Paragraph 23.

24.      Following the expiration of the initial term of the MBuy Authorization, on January 8, 2019, the parties entered into a Mutual Business Agreement (in the same form as its predecessor form, the MBuy Authorization) for the calendar year 2019 and a contemplated $5,000,000 advertising campaign.   A true and correct copy of the Mutual Business Agreement is submitted herewith as Exhibit D.

**ANSWER:**

SCOTTeVEST admits the allegation in Paragraph 24, but affirmatively avers it entered into the Mutual Business Agreement based on MBuy's intentional and false representations, concerning the effectiveness of SCOTTeVEST's advertising spending, as alleged with greater particularity in its Counterclaim.

25. The Mutual Business Agreement was executed by Marshall Rule on behalf of the Defendant in his capacity as its President.

**ANSWER:**

SCOTTeVEST admits the allegation in Paragraph 25.

26. Pursuant to the Mutual Business Agreement, MBuy prepared and presented Defendant with an Insertion Order specifically seeking authorization from Defendant for various media purchases to "run" from January 1, 2019 to January 31, 2019. A true and correct copy of the 2018 Insertion Orders are submitted herewith as Exhibit E.

**ANSWER:**

SCOTTeVEST admits the allegation in Paragraph 26, but affirmatively avers the parties intended to monitor and adjust the allocation of the media purchased on a daily basis in order to optimize SCOTTeVEST's media spending.

27. The January 2019 Insertion Order had the same terms as those set forth in paragraph 15 above, and incorporated by reference the complete terms and conditions set forth in Exhibit C.

**ANSWER:**

SCOTTeVEST denies any allegations contrary to or inconsistent with Exhibit C, which document is the best evidence of its terms. SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the allegations in the second clause of

Paragraph 27 because it does not know whether Exhibit C contains "terms and conditions" as they existed in January of 2019.

28.     The January 2019 Insertion Order was executed by Marshall Rule on behalf of the Defendant in his capacity as its President.

**ANSWER:**

Defendant admits to the allegation in Paragraph 28.

29.     The media purchase authorized by the Defendant in connection with the January 2019 Insertion Order was $115,000.  MBuy executed all of the authorized purchases identified in the January 2019 Insertion Order, all of which ran as contemplated.

**ANSWER:**

SCOTTeVEST admits the allegation in the first sentence of Paragraph 29, but affirmatively avers the parties intended to monitor and adjust the allocation of the media purchased on a daily basis in order to optimize SCOTTeVEST's media spending. SCOTTeVEST has insufficient insufficient information upon which to form a belief as to the truth or falsity of the remaining allegations in Paragraph 29.

30.     By invoice dated January 11, 2019, MBuy requested payment of $219,681.88 for media purchases in December 2018, most of which represented MBuy's "hard costs" payable to third party media.  A true and correct copy of the Invoice is submitted herewith as Exhibit F.

**ANSWER:**

SCOTTeVEST admits that MBuy generated and transmitted an invoice dated January 11, 2019, which is attached as Exhibit F.  SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the remaining allegations in Paragraph 30 as

it does not know the extent to which Exhibit F represents the markup or profit margin charged by MBuy under the parties' agreement.

31. By invoice dated January 14, 2019, MBuy requested payment of $104,292.21 for media purchases in January 2019, most of which represented MBuy's "hard costs" payable to third party media. A true and correct copy of the Invoice is submitted herewith as Exhibit G.

**ANSWER:**

SCOTTeVEST admits that MBuy generated and transmitted an invoice dated January 14, 2019, which is attached as Exhibit G. SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the remaining allegations in Paragraph 31 as it does not know the extent to which Exhibit F represents the markup or profit margin charged by MBuy under the parties' agreement.

32. The invoices were payable within 30 days.

**ANSWER:**

SCOTTeVEST admits the allegations in Paragraph 32.

33. Defendant did not pay either of the referenced invoices in a timely fashion.

**ANSWER:**

SCOTTeVEST admits that it did not pay the invoices, but affirmatively avers that its duty of performance was discharged by MBuy's breach of the parties' agreement as alleged with greater particularity below and in its Counterclaim.

34. Despite repeated demands for payment, Defendant has failed and refused to pay the invoiced amounts.

**ANSWER:**

SCOTTeVEST admits that it has not paid the invoiced amounts.  SCOTTeVEST denies the remaining allegations in Paragraph 34, and affirmatively avers it has communicated at various times with MBuy about the amounts MBuy claims is owed, along with its claims against MBuy, and that its duty of performance was discharged by MBuy's breach of the parties' agreement.

## COUNT I – BREACH OF CONTRACT (2018 INSERTION ORDERS)

35.    MBuy incorporates by reference paragraphs 1-34 above.

**ANSWER:**

SCOTTeVEST incorporates by reference the allegations contained in Paragraphs 1 through 34 of its Answer to the Complaint as if fully set forth herein.

36.    The 2018 Insertion Orders prepared for and presented to Defendant constitute an offer by MBuy to perform services pursuant to the terms set forth therein and incorporated by reference from www.mbuy.com/tc (Exhibit C), as well as the MBuy Authorization (Exhibit A).

**ANSWER**:

SCOTTeVEST admits only that the 2018 Insertion Orders constitute offers to purchase various types of media at a certain cost, and that they incorporate by reference terms from www.mbuy.com/tc, but claims to supercede any inconsistent terms contained therein. SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the allegations that Exhibit C contains  the"terms and conditions" as they existed as of the date MBuy transmitted, or SCOTTeVEST, executed the 2018 Insertion Orders. SCOTTeVEST affirmatively avers the parties intended to attach a SCOTTeVEST

Marketing/Creative Agency Scope of Work to their contractual documents, but failed to do so by mutual mistake because the MBuy Authorization was executed and exchanged electronically.

37.    By executing the 2018 Insertion Orders, Defendant accepted the offer described above.

**ANSWER:**

SCOTTeVEST admits it accepted the terms contained in the MBuy Authorization, the 2018 Insertion Orders, and such terms and conditions viewable ar www.mbuy.com/tc as they existed prior to its execution of the 2018 Insertion Orders, and of which it had prior knowledge. SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the allegations in Paragraph 36 that Exhibit C contains the"terms and conditions" as they existed as of the date MBuy transmitted, or SCOTTeVEST, executed the 2018 Insertion Orders. SCOTTeVEST further affirmatively avers the parties intended to monitor and adjust the allocation of the media purchased on a daily basis in order to optimize SCOTTeVEST's media spending as outlined in the MBuy Authorization.

38.    There was consideration exchanged in the form of mutual promises by and between the parties as described above, thereby supporting the formation of a valid and enforceable contract (or contracts) based upon the terms set forth above.

**ANSWER:**

SCOTTeVEST admits that it exchanged certain promises with MBuy to bind the parties to a contract as previously set forth in its Answer.

39.    MBuy performed its obligations under the parties' contract(s).

**ANSWER:**

SCOTTeVEST denies that MBuy performed its obligations under the parties' contract, *inter alia*, in the following ways: (A) Mbuy failed to properly manage and monitor SCOTTeVEST's overall advertising expenditures, causing it to misallocate significant resources to advertising that was not effective or profitable while not directing expenditures toward other advertising campaigns and platforms that were profitable; (B) MBuy failed to properly manage, oversee, and optimize SCOTTeVEST's television advertising spending by (i) directing the purchase of media at incorrect times that did not capitalize on the holiday shopping season, which is SCOTTeVEST's most important business period, and (ii) not evaluating and testing which variations of television advertisements were performing best, or (iii) which networks provided the optimal return on SCOTTeVEST's investment; (C) MBuy failed to monitor and adjust SCOTTeVEST's advertising on a daily basis in order to optimize its advertising expenditures; (D) MBuy delayed the launch of a shopping wizard in the second week of December instead of November to capitalize on the holiday shopping season, which did not optimize SCOTTeVEST's advertising spending; and (E) Mbuy failed to properly manage digital advertising by (i) not retargeted users on Facebook after they had viewed ads on YouTube, (ii) not setting audiences correctly for Facebook ads, (iii) not optimizing SCOTTeVEST's spending for the highest performing ads in Facebook, (iv) not timing Facebook ads to coincide with Cyber Monday, and (v) not optimizing or scaling SCOTTeVEST's Amazon advertising; and (E) MBuy failed to provide accurate information on the effectiveness of SCOTTeVEST's advertising expenditures by not accurately attributing the effect of various types of advertising and miscalculating SCOTTeVEST's Return on Advertising Investment, which prohibited a correct, integrated assessment of all its advertising spending.

40.     Defendant breached the contract(s) by failing to pay sums due and owing thereunder (as reflected in the invoice submitted as Exhibit D) to MBuy.

**ANSWER:**

SCOTTeVEST denies the allegations contained in Paragraph 40.

41.     As a direct and proximate result of Defendant's breach of the contract(s), MBuy has been damaged in an amount equal to at least $219,681.88.

**ANSWER:**

SCOTTeVEST denies the allegations contained in Paragraph 41.

42.     Under these circumstances, MBuy should be entitled to and seeks an award of prejudgment interest on the unpaid invoices pursuant to the Interest Act (815 ILCS 205/0.01 et seq).

**ANSWER:**

SCOTTeVEST denies the allegations contained in Paragraph 42.

43.     Finally, pursuant to the terms and condition of the contract (Exhibit C, ¶ 13.10), MBuy is entitled to recover its attorneys' fees and costs incurred in connection with these proceedings.

**ANSWER:**

SCOTTeVEST denies the allegations contained in Paragraph 43.

WHEREFORE, Defendant/Counter-Plaintiff, SCOTTeVEST, Inc. denies that Plaintiff/Counter-Defendant, Media Bank, LLC, is entitled to any relief whatsoever, and prays for the entry of judgment in its favor.

### COUNT II - BREACH OF CONTRACT (2019 INSERTION ORDER)

44.     MBuy incorporates by reference paragraphs 1-43 above.

**ANSWER:**

SCOTTeVEST incorporates by reference the allegations contained in Paragraphs 1 through 43 of its answer to the Complaint as if fully set forth herein.

45.     The 2019 Insertion Order prepared for and presented to Defendant constitutes an offer by MBuy to perform services pursuant to the terms set forth therein and incorporated by reference from www.mbuy.com/tc (Exhibit C), as well as the Mutual Business Agreement (Exhibit D).

**ANSWER:**

SCOTTeVEST admits only that the 2019 Insertion Order constitutes an offer to purchase various types of media at a certain cost, and that it incorporates by reference terms from www.mbuy.com/tc, but claims to supercede any inconsistent terms contained therein. SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the allegations that Exhibit C contains the "terms and conditions" as they existed as of the date MBuy transmitted, or SCOTTeVEST, executed the 2019 Insertion Order. SCOTTeVEST affirmatively avers the parties intended to attach a SCOTTeVEST Marketing/Creative Agency Scope of Work to their contractual documents, but failed to do so by mutual mistake because the MBuy Authorization and Mutual Business Agreement were executed and exchanged electronically.

46.     By executing the 2019 Insertion Order, Defendant accepted the offer described above.

**ANSWER:**

SCOTTeVEST admits it accepted the terms contained in the MBuy Authorization, the 2019 Insertion Order, and such terms and conditions viewable ar www.mbuy.com/tc as they existed prior to its execution of the 2019 Insertion Order, and of which it had prior knowledge.

SCOTTeVEST has insufficient information upon which to form a belief as to the truth or falsity of the allegations in Paragraph 36 that Exhibit C contains the "terms and conditions" as they existed as of the date MBuy transmitted, or SCOTTeVEST, executed the 2019 Insertion Order. SCOTTeVEST further affirmatively avers the parties intended to monitor and adjust the allocation of the media purchased on a daily basis in order to optimize SCOTTeVEST's media spending as outlined in the MBuy Authorization.

47.     There was consideration exchanged in the form of mutual promises by and between the parties as described above, thereby supporting the formation of a valid and enforceable contract based upon the terms set forth above.

**ANSWER:**

SCOTTeVEST admits that it exchanged certain promises with MBuy to bind the parties to a contract as previously set forth in its Answer.

48.     MBuy performed its obligations under the parties' contract.

**ANSWER:**

SCOTTeVEST denies that MBuy performed its obligations under the parties' contract, *inter alia*, in the following ways: (A) Mbuy failed to properly manage and monitor SCOTTeVEST's overall advertising expenditures, causing it to misallocate significant resources to advertising that was not effective or profitable while not directing expenditures toward other advertising campaigns and platforms that were profitable; (B) MBuy failed to properly manage, oversee, and optimize SCOTTeVEST's television advertising spending by (i) directing the purchase of media at incorrect times that did not capitalize on the holiday shopping season, which is SCOTTeVEST's most important business period, and (ii) not evaluating and testing which variations of television advertisements were performing best, or (iii) which networks provided the optimal return on SCOTTeVEST's investment; (C) MBuy failed to monitor and

adjust SCOTTeVEST's advertising on a daily basis in order to optimize its advertising expenditures; (D) MBuy delayed the launch of a shopping wizard in the second week of December instead of November to capitalize on the holiday shopping season, which did not optimize SCOTTeVEST's advertising spending; and (E) Mbuy failed to properly manage digital advertising by (i) not retargeted users on Facebook after they had viewed ads on YouTube, (ii) not setting audiences correctly for Facebook ads, (iii) not optimizing SCOTTeVEST's spending for the highest performing ads in Facebook, (iv) not timing Facebook ads to coincide with Cyber Monday, and (v) not optimizing or scaling SCOTTeVEST's Amazon advertising; and (E) MBuy failed to provide accurate information on the effectiveness of SCOTTeVEST's advertising expenditures by not accurately attributing the effect of various types of advertising and miscalculating SCOTTeVEST's Return on Advertising Investment, which prohibited a correct, integrated assessment of all its advertising spending.

49.     MBuy breached the contract by failing to pay sums due and owing thereunder (as reflected in the invoice submitted as Exhibit F) to MBuy.

**ANSWER:**

SCOTTeVEST denies the allegations contained in Paragraph 49.

50.     As a direct and proximate result of Defendant's breach of the contract, MBuy has been damaged in an amount equal to at least $104, 292.21.

**ANSWER:**

SCOTTeVEST denies the allegations contained in Paragraph 50.

WHEREFORE, Defendant/Counter-Plaintiff, SCOTTeVEST, Inc. denies that Plaintiff/Counter-Defendant, Media Bank, LLC, is entitled to any relief whatsoever, and prays for the entry of judgment in its favor.

## COUNT III – UNJUST ENRICHMENT

SCOTTeVEST has sought dismissal of Count III under Federal Rule of Civil Procedure 12(b)(6).

## COUNTERCLAIM

Defendant/Counter-Plaintiff, SCOTTeVEST, Inc. ("SCOTTeVEST") by and through its attorneys, Elvis Gonzalez, Ltd., for its Counterclaim against Plaintiff/Counter-Defendant, Media Bank, LLC ("MBuy"), alleges as follows:

## FACTUAL BACKGROUND

1.      SCOTTeVEST is an online apparel company that specializes in garments with conduit systems and specialized compartments for holding portable electronic devices and other personal items.  It spends considerable amounts on advertising, which is a core driver of its revenue.

2.      SCOTTeVEST utilizes various types of advertising to drive traffic to its website. While SCOTTeVEST disproportionately relies on television advertising, it also utilizes digital advertising channels, and had previously employed multiple media-buying agencies and digital vendors to effectuate its advertising initiatives.

3.      In an effort to increase growth, SCOTTeVEST began a search for parties to improve its branding and better manage its advertising in 2018.  It discussed possible relationships with numerous creative agencies, including Quirk Creative ("Quirk"). SCOTTeVEST's intention was to find a creative agency to help it produce more effective television advertisements.

4.      As part of its discussions with Quirk, SCOTTeVEST was introduced to MBuy. Quirk presented MBuy as its partner, which managed and measured the effectiveness of media and advertising efforts using proprietary technology.  MBuy further described its proprietary

technology as providing real-time, cross-channel performance measurements in a user-friendly "dashboard" format. This would permit a client to observe actual, real-time measurements of the effectiveness of all types of media purchases, including television and digital, in order to obtain accurate information to optimize the performance of advertising campaigns. Mbuy represented that its attribution model was unique, and permitted more accurate, reliable measurements of advertising efforts.

5.     Although SCOTTeVEST intended to maintain its existing media-buying vendors while hiring a new creative agency, MBuy persuaded it to work exclusively with Quirk and MBuy based on MBuy's representations that hiring them would permit comprehensive planning, management, and oversight of all aspects of SCOTTeVEST's advertising by one set of creative and media-buying agencies.

6.     As a result, SCOTTeVEST terminated its relationships with all other digital vendors to work exclusively with MBuy and Quirk. MBuy further persuaded SCOTTeVEST to continue utilizing its existing television-buying agency, which MBuy would oversee, until MBuy could effectively transition television-buying. To that end, SCOTTeVEST formally appointed MBuy as its exclusive agency of record to purchase all media on its behalf.

7.     Consistent with its representations to SCOTTeVEST, the MBuy Authorization required MBuy to, *inter alia*, provide SCOTTeVEST with access to MBuy's proprietary Managed Media Services & Technology Platform. This included "optimized media negotiation and buying services, strategic media planning, market rate analysis, ongoing placement, execution, trafficking and stewardship of campaigns, a single point of accountability for all media types, consolidated billing and ROI reporting." (See Ex. A to Pl.'s Compl., Docket No. 1, §4).

8.	MBuy's fundamental contractual undertaking was its responsibility to optimize SCOTTeVEST's media spending on all platforms, including both television and digital media. This necessarily required it to plan, oversee, measure, and evaluate SCOTTeVEST'S advertising expenditures, through the use of its attribution model, to ensure it was deploying resources in an optimal fashion. MBuy was also required to provide SCOTTeVEST with accurate, real-time information about the profitability of its advertising across all channels through its proprietary technology platform, which included a dashboard that purported to contain accurate attribution and measurement of media expenditures, and revenues realized as a result of such expenditures ("the Dashboard").

9	Pursuant to MBuy's obligations, it reviewed SCOTTeVEST's existing television buying strategy and advised it to increase its "direct response" television buying. Further, MBuy, through Oliver Harper, indicated in an e-mail dated October 18, 2018 that it would be monitoring the spending, and adjusting it as necessary.

10.	Notwithstanding the foregoing obligations, MBuy materially breached the MBuy Authorization by, *inter alia*:

- Failing to properly manage and monitor SCOTTeVEST's overall advertising expenditures, causing it to misallocate significant resources to advertising that was not effective or profitable while not directing expenditures toward other advertising campaigns and platforms that were profitable;

- Failing to properly manage, monitor, and optimize SCOTTeVEST's television advertising spending by (i) purchasing media at incorrect times that did not capitalize on the holiday shopping season, which is SCOTTeVEST's most important business period, and (ii) not evaluating and testing which variations of television advertisements were performing best, or (iii) which networks provided the optimal return on SCOTTeVEST's investment;

- Failing to monitor and adjust SCOTTeVEST's advertising on a daily basis in order to optimize its advertising expenditures;

- Delaying the launch of a shopping wizard in the second week of December instead of November to capitalize on the holiday shopping season, which did not optimize SCOTTeVEST's advertising spending;

- Failing to properly manage digital advertising by (i) not retargeted users on Facebook after they had viewed ads on YouTube, (ii) not setting audiences correctly for Facebook ads, (iii) not optimizing SCOTTeVEST's spending for the highest performing ads in Facebook, (iv) not timing Facebook ads to coincide with Cyber Monday, and (v) not optimizing or scaling SCOTTeVEST's Amazon advertising; and

- Failing to provide accurate information on the effectiveness of SCOTTeVEST's advertising expenditures by not accurately attributing the effect of various types of advertising and miscalculating SCOTTeVEST's Return on Advertising Investment, which prohibited a correct, integrated assessment of all SCOTTeVEST's advertising spending.

11.    MBuy's decision to direct greater advertising expenditures on ineffective television advertising was made solely to advantage Quirk, the creative agency that brought MBuy into its commercial relationship with SCOTTeVEST, and without consideration of its profitability or SCOTTeVEST's business interests. To wit, Andrew Strocko, stated in words or substance during a conversation with Scott Jordan of SCOTTeVEST that MBuy was investing money in a shopping wizard against its better judgment because it felt an obligation to Quirk.

12.    In addition, during the course of providing services to SCOTTeVEST, MBuy repeatedly made material misrepresentations about the effectiveness of advertising campaigns in order to give the appearance of greater effectiveness to benefit itself and Quirk.  Specifically, information contained in monthly reports and the Dashboard was false, including, *inter alia*, the return on advertising spending, and the revenue attributable to various types of advertising spending.  MBuy reached this false calculation by overstating and misattributing revenue across advertising platforms, and selectively choosing the costs it included, which specifically excluded the costs of television advertising and Quirk's creative services.

13.     Based upon the false representations contained in the Dashboard and monthly reports, SCOTTeVEST continued its allocation of advertising spend, which was in reality, ineffective and caused it significant financial losses.

14.     During the course of the parties' relationship, SCOTTeVEST also granted MBuy with access to, and control of, various social media accounts, including its Facebook account, to facilitate the provision of services contemplated between the parties ("the Social Media Accounts").  Nevertheless, MBuy has since failed and refused to return access and control of the Social Media Accounts to SCOTTeVEST, which denies SCOTTeVEST its property and data, and certain work-product developed for it by MBuy.

COUNT I
(BREACH OF CONTRACT)

15.     SCOTTeVEST incorporates by reference the allegations contained in Paragraphs 1 through 14 of its Counterclaim as if fully set forth herein.

16.     SCOTTeVEST has performed all obligations required of it under the MBuy Authorization; specifically, it has paid MBuy $763,097.05.

17.     MBuy's conduct alleged herein constituted material breaches of the MBuy Authorization, which proximately caused SCOTTeVEST harm.

18.     As a direct and proximate result of MBuy's breach, SCOTTeVEST has been harmed.

WHEREFORE, Defendant/Counter-Plaintiff, SCOTTeVEST, Inc., prays that judgment be entered in its favor and against Plaintiff/Counter-Defendant, Media Bank, LLC, in an amount to be determined at trial, but in no event less than $75,000.00, and for such other and further relief as the Court deems just and equitable.

## COUNT II
## (NEGLIGENT MISREPRESENTATION)

19.     SCOTTeVEST incorporates by reference the allegations contained in Paragraphs 1 through 18 of its Counterclaim as if fully set forth herein.

20.     In communicating false information in the Dashboard and monthly reports, MBuy made a misrepresentation of a material fact.  Had MBuy disclosed to SCOTTeVEST the actual effectiveness of various campaigns, it would have not continued the existing allocation of advertising spending and would have altered its advertising expenditures to avoid the losses it eventually suffered.

21.     MBuy's misrepresentations in the Dashboard and monthly reports were intended to induce a false belief by SCOTTeVEST that its advertising spending was extremely successful.

22.     SCOTTeVEST could not have discovered the truth about MBuy's reporting of advertising effectiveness because it had no technical expertise in the analysis of the information presented in the Dashboard and monthly reports, it did not have access to all information necessary to uncover the actual expenditures made and revenues received, and it did not receive information indicating the actual costs of its advertising expenditures in real-time.

23.     SCOTTeVEST relied on MBuy's aforementioned statements to its detriment by continuing ineffective advertising spending.

24.     MBuy is in the business of providing information to others for guidance in their business decision-making as its business activity is analyzing and optimizing the media buying strategies of businesses.

25.     As a direct and proximate result of MBuy's statements, SCOTTeVEST has been harmed as alleged with greater particularity herein when it suffered significant economic losses.

WHEREFORE, Defendant/Counter-Plaintiff, SCOTTeVEST, Inc., prays that judgment be entered in its favor and against Plaintiff/Counter-Defendant, Media Bank, LLC, in an amount to be determined at trial, but in no event less than $75,000.00, and for such other and further relief as the Court deems just and equitable.

COUNT III
(BREACH OF FIDUCIARY DUTY)

26.     SCOTTeVEST incorporates by reference the allegations contained in Paragraphs 1 through 25 of its Counterclaim as if fully set forth herein.

27.     At all relevant times, MBuy owed SCOTTeVEST a fiduciary duty due to a disparity in the parties' expertise and sophistication in analyzing, attributing, and optimizing advertising spending, which caused SCOTTeVEST to repose trust and confidence in MBuy, which it accepted.

28.     MBuy breached the fiduciary duty it owed by placing its interests and the interests of Quirk above those of SCOTTeVEST, and taking advantage of SCOTTeVEST's lack of experience concerning analysis of advertising spending integrated across all platforms.  MBuy caused SCOTTeVEST to make significant expenditures on ineffective and unprofitable advertising, which directly benefited MBuy and Quirk financially.

29.     As a direct and proximate result of the breach of MBuy's fiduciary duties, SCOTTeVEST has been harmed.

WHEREFORE, Defendant/Counter-Plaintiff, SCOTTeVEST, Inc., prays that judgment be entered in its favor and against Plaintiff/Counter-Defendant, Media Bank, LLC, in an amount to be determined at trial, but in no event less than $75,000.00, and for such other and further relief as the Court deems just and equitable.

## COUNT IV
## (RESCISSION OF THE 2019 MUTUAL BUSINESS AGREEMENT)

30.     SCOTTeVEST incorporates by reference the allegations contained in Paragraphs 1 through 14 of its Counterclaim as if fully set forth herein.

31.     SCOTTeVEST agreed to enter into the 2019 Mutual Business Agreement with MBuy based on MBuy's representations in the Dashboard and monthly reports as to the effectiveness and profitability of its advertising campaigns.

32.     As alleged with greater particularity herein, the information contained in the Dashboard and monthly reports was false, and constituted misrepresentations of a material fact.

33.     MBuy's misrepresentations in the Dashboard and monthly reports were intended to induce a false belief by SCOTTeVEST that its advertising spending was extremely successful.

34.     SCOTTeVEST could not have discovered the truth about MBuy's reporting of advertising effectiveness because it had no technical expertise in the analysis of the information presented in the Dashboard and monthly reports, and because it did not have access to all information necessary to uncover the actual expenditures made and revenues received.

35.     SCOTTeVEST relied on MBuy's aforementioned statements to its detriment by continuing ineffective advertising spending and entering into the 2019 Mutual Business Agreement.

WHEREFORE, Defendant/Counter-Plaintiff, SCOTTeVEST, Inc., prays that judgment be entered in its favor and against Plaintiff/Counter-Defendant, declaring the 2019 Mutual Business Agreement between the parties to be void and of no legal effect, and for such other and further relief as the Court deems just and equitable.

## COUNT V
## (CONVERSION)

36.     SCOTTeVEST incorporates by reference the allegations contained in Paragraphs

1 through 35 of its Counterclaim as if fully set forth herein.

37.     In failing to return the Social Media Accounts to SCOTTeVEST, MBuy has

assumed unauthorized and wrongful control over SCOTTeVEST's property.

38.     By virtue of its ownership interest in the Social Media Accounts, SCOTTeVEST

has a right in, and an absolute and unconditional right to, their immediate possession.

39.     On February 21, 2019, SCOTTeVEST demanded the return of the Social Media

Accounts, which demand Mbuy has refused.

WHEREFORE, Defendant/Counter-Plaintiff, SCOTTeVEST, Inc., prays that judgment

be entered in its favor and against Plaintiff/Counter-Defendant, Media Bank, LLC, ordering the

return to SCOTTeVEST of all wrongfully distrained property interests in social media accounts,

and for such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

SCOTTeVEST, INC.


/s/ Elvis D. Gonzalez
By:  Its One of its Attorneys

Elvis D. Gonzalez (ARDC NO. 6280115)
egonzalez@elvisgonzalezltd.com
ELVIS GONZALEZ, LTD.
233 South Wacker Drive, Suite 6149
Chicago, Illinois 60606
312-558-9779
404171.7-12480.00100