**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MEDIA BANK, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-2465 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| SCOTTeVEST, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant SCOTTeVEST, Inc. is in the business of designing and selling vests, outerwear, and other apparel. It sells its clothes online, mostly on its website. To get the word out about its products, SCOTTeVEST invests heavily in a variety of advertising channels. And it has help. The company uses third parties to manage, analyze, and execute its promotional efforts.

Not all of the advertising campaigns have gone according to plan. Sales during the 2018 holiday shopping season were particularly disappointing. The lackluster sales led SCOTTeVEST to have a falling out with Plaintiff Media Bank, LLC ("MBuy"), its advertising manager.

In 2019, SCOTTeVEST refused to pay two invoices issued by MBuy for advertising, claiming that MBuy had failed to hold up its end of the contracts. The two invoices totaled over $300,000. MBuy responded by suing for the amounts owed. And SCOTTeVEST, in turn, counterclaimed for breach of contract, plus four other claims.

MBuy later moved to dismiss SCOTTeVEST's counterclaims. For the reasons that follow, the motion is granted in part and denied in part.

## Background[1]

SCOTTeVEST is an online apparel company that "specializes in garments with conduit systems and specialized compartments for holding portable electronic devices and other personal items." *See* Counterclaim, at ¶ 1 (Dckt. No. 12). In other words, it sells clothes with a lot of pockets. For example, on the company's website, a consumer can buy vests with up to 42 pockets, including 24 on the outside and 18 on the inside. *See* Answer, at ¶ 4 (Dckt. No. 12); *see also* www.scottevest.com (last visited November 16, 2020). The pockets range in size from small enough for a pen to large enough for a 15'' laptop.

SCOTTeVEST primarily sells its products online, through its own website and on Amazon. *See* Answer, at ¶ 4 (Dckt. No. 12). To drive traffic to its website, it invests in different forms of advertising. *See* Counterclaim, at ¶ 2 (Dckt. No. 12). It primarily purchases television ads, but it also spends money on digital advertising. *Id.* It uses outside vendors to place all of those ads and evaluate their effectiveness. *Id.*

In 2018, SCOTTeVEST wanted more effective television ads. *Id.* at ¶ 3. So it explored relationships with a number of creative agencies to improve its branding and better manage its advertising. *Id.* SCOTTeVEST ultimately connected with MBuy. *Id.* at ¶ 4. MBuy's business is media management – it works with companies to plan and purchase ads in television, radio, print, and digital media. *See* Answer, at ¶ 2 (Dckt. No. 12).

---

[1] The facts come from the allegations of the counterclaims, as well as the uncontested portions of Plaintiff's complaint and the accompanying exhibits. The Court assumes that the allegations of the counterclaims are true for purposes of the motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). The content of the contracts is fair game on a motion to dismiss. A court may consider a document that is central to a claim (like a contract in a breach-of-contract case) without converting a motion to dismiss into a motion for summary judgment. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009).

MBuy provides information to measure the effectiveness of advertising. MBuy provides real-time, cross-channel performance measurements in a user-friendly "dashboard" format. *See* Counterclaim, at ¶ 4 (Dckt. No. 12). MBuy enables its clients to observe actual, real-time measurements for the effectiveness of all types of media purchases. *Id.* MBuy "represented that its attribution model was unique, and permitted more accurate, reliable measurements of advertising efforts." *Id.*

SCOTTeVEST ultimately decided to work exclusively with MBuy and terminated its relationships with all other digital vendors. *Id.* at ¶ 6. SCOTTeVEST appointed MBuy as its exclusive agency of record to purchase all media on its behalf. *Id.* SCOTTeVEST engaged MBuy to analyze, evaluate, and manage its media purchases and provide proprietary information to improve the effectiveness of its advertising. *See* Answer, at ¶ 8 (Dckt. No. 12).

SCOTTeVEST and MBuy signed two contracts – one in 2018, and the other in 2019. The first agreement was called "MBuy Authorization," and the second agreement was titled "Mutual Business Agreement." *See* Cplt., at Ex. A (Dckt. No. 1, at 11 of 44); *id.* at Ex. D (Dckt. No. 1, at 36 of 44). The provisions of the agreements are largely the same (for present purposes, anyway), except for the amount of money and the length of time. The Court will refer to them as the "Agreements."

SCOTTeVEST and MBuy signed the first agreement in June 2018. *See* Cplt., at Ex. A (Dckt. No. 1). That agreement contemplated advertising efforts across "Digital," "Traditional," and "DRTV" media to run during the second half of 2018. *Id.* All told, the 2018 agreement's planned media spending totaled more than $2 million across the three media types. *Id.*

SCOTTeVEST and MBuy signed the second agreement in January 2019. *Id.* at Ex. D. The 2019 agreement covered "All" media types and had an "Addressable Budget" of about $5,000,000 for a national media campaign for the year. *Id.*

The Agreements are, by modern contractual standards, rather spartan. They are confined to a single page, and they contain ten numbered paragraphs (but they're missing #8, so they actually contain nine paragraphs). *Id.* at Exs. A, D. By and large, the terms are undefined.

A few of the provisions are germane to the motion at hand. First, the Agreements described in general terms the services that MBuy agreed to provide. Under the heading "Getting Started," MBuy agreed to use its expertise to perform "market analysis, negotiation(s), rate preparations and media purchases":

> The purpose of this agreement is to clearly establish the roles and responsibilities of the parties involved in the planning, negotiation, and purchasing of media inventory. To optimize and analyze your media buys for maximized results, MBuy will leverage its proprietary tools, technology, processes, and expertise to perform single source market analysis, negotiation(s), rate preparations and media purchases for **ScotteVest** (the "Advertiser").

*Id.* (emphasis in original).

Second, the Agreements briefly described the obligations of each party when it came to information sharing. Under the heading "What We Do – MBuy Technology Platform Value," the Agreements required MBuy to "provide access, via a dedicated MBuy account representative, to our proprietary Managed Media Services & Technology Platform[.]" *Id.* And, under the heading "Working Together – Advertiser Responsibilities," the Agreements required SCOTTeVEST to work with MBuy and share information:

> Advertiser agrees to work with MBuy to communicate advertising campaign goals, key performance indicators, vendor selection, and overall marketing objectives. In order to receive actionable and optimized media plans and rate preparations from MBuy, the

> Advertiser agrees to provide relevant current and/or historical media unit rates and budgets for purposes of rate analysis and media buy optimization.

*Id.*

Finally, the Agreements laid out a process for actually buying ads. The Agreements did not give MBuy the green light to buy any particular advertising. *See* Answer, at ¶ 12 (Dckt. No. 12). Instead, the Agreements provided that the next step was something called an "Insertion Order," meaning a proposal describing the ads that MBuy thought SCOTTeVEST should buy. *See* Cplt., at Ex. A (Dckt. No. 1, at 11 of 44) ("**What Comes Next? Insertion Order**") (emphasis in original); *id.* at Ex. D (Dckt. No. 1, at 36 of 44) (same).

MBuy basically requested authorization for particular advertising by sending Insertion Orders to SCOTTeVEST. The Insertion Orders contained details about specific ads that MBuy proposed buying. *See* Answer, at ¶ 12 (Dckt. No. 12). If and when SCOTTeVEST approved specific Insertion Orders, MBuy would place the ads in the agreed channels. *Id.* At that point, MBuy would send invoices to SCOTTeVEST.

SCOTTeVEST approved several MBuy Insertion Orders during 2018 and 2019. *Id.* at ¶¶ 13–15, 26–27. The Insertion Orders listed the media type, media description, geography, start and end dates, and cost of the proposed purchase.

Three of those Insertion Orders are now at issue. In August 2018, SCOTTeVEST signed an Order authorizing the purchase of ads totaling $815,000 across a range of media types. *See* Cplt., at Ex. B (Dckt. No. 1, at 13 of 44). In December 2018, SCOTTeVEST authorized the purchase of $15,000 of search-based ads. *Id.* at Ex. B (Dckt. No. 1, at 16 of 44). And in January 2019, SCOTTeVEST approved another $115,000 of advertising across a range of media. *Id.* at Ex. E (Dckt. No. 1, at 38 of 44).

Like the Agreements, the Insertion Orders were spartan, too. They contained relatively few provisions. Each Order spanned a page or two and covered general guidelines and limitations of liability, ad placement, confidentiality, payment, and acceptance of terms. *Id.* at Exs. B, E. The Orders contained an integration clause, making clear that the Orders, the Agreements, and the Terms and Conditions on the MBuy website constituted the entire agreement. *Id.* ("This agreement, along with the mutually signed Mutual Business Agreement and terms and conditions at www.mbuy.com/tc, which are incorporated by reference, contain the entire agreement of the parties and supersedes all prior discussions, agreements and undertakings between the parties with respect to the subject matter hereof[.]").

The Terms and Conditions, spanning 15 pages, were more extensive than the Agreements and the Insertion Orders. *See id.* at Ex. C. MBuy draws attention to four provisions in its briefs, but only two provisions are relevant here. First, MBuy had five business days to "cure" any deficiencies in reports that SCOTTeVEST believed were incomplete or inaccurate. *Id.* at § 5.3. Second, the parties agreed to a disclaimer of warranties and a limitation of liability. *Id.* at §§ 11.2, 12.1, 12.4.

MBuy sent invoices to SCOTTeVEST after purchasing the media authorized in the Insertion Orders. Two invoices are at issue here. On January 11, 2019, MBuy sent SCOTTeVEST an invoice for $219,681.88. *See* Answer, at ¶ 30 (Dckt. No. 12). And on January 14, 2019, MBuy sent a second invoice for $104,292.21 dated January 14, 2019. *Id.* at ¶ 31.

Holiday sales in 2018 did not meet SCOTTeVEST's expectations. SCOTTeVEST blamed the promotions and balked at paying the invoices. *Id.* at ¶¶ 33–34. SCOTTeVEST took the position that MBuy had failed to properly manage and monitor its advertising. In its view,

MBuy invested in advertising that flopped, and failed to invest in advertising that would have worked. *See* Counterclaim, at ¶ 10 (Dckt. No. 12). This litigation followed.

MBuy filed a three-count complaint, alleging breach of contract based on the unpaid invoices, plus a claim for unjust enrichment. SCOTTeVEST later answered, denying a breach because MBuy had failed to live up to its end of the deal. *See generally* Answer (Dckt. No. 12). SCOTTeVEST also advanced five counterclaims against MBuy, including breach of contract, negligent misrepresentation, breach of fiduciary duty, rescission, and conversion. *See generally* Counterclaims (Dckt. No. 12).

MBuy now moves to dismiss all of the counterclaims. SCOTTeVEST later dropped the rescission claim, so only four counterclaims remain. The motion to dismiss the breach of contract claim is denied, and the motion to deny the remaining counterclaims is granted.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint (or the counterclaim) and draws all reasonable inferences in the claimant's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a motion to dismiss for failure to state a claim, the complaint must provide fair notice of the basis for the claim and must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Discussion

### I.    Breach of Contract

SCOTTeVEST's first counterclaim is for breach of contract.  *See* Counterclaim, at ¶¶ 15–18 (Dckt. No. 12).  The gist of the claim is that MBuy promised to provide expertise and information, but failed to deliver.  More specifically, MBuy did not follow through on its "fundamental contractual undertaking" to "optimize SCOTTeVEST's media spending on all platforms, including both television and digital media."  *Id.* at ¶ 8.

Under Illinois law, a claim for breach of contract requires:  (1) the existence of a valid and enforceable agreement; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff.  *Nielsen v. United Services Auto. Assoc.*, 244 Ill. App. 3d 658, 183 Ill. Dec. 874, 612 N.E.2d 526, 528 (2d Dist. 1993).  The issue here is what, exactly, MBuy agreed to do.

The counterclaim offers a number of examples of how MBuy allegedly did not live up to its end of the contracts.  SCOTTeVEST identifies the alleged breaches in six bullet points.  *See* Counterclaim, at ¶ 10 (Dckt. No. 12).  According to SCOTTeVEST, MBuy failed to (1) "properly manage and monitor" its overall advertising spending; (2) "properly manage, monitor, and optimize" its television advertising spending; (3) monitor and adjust its advertising on a daily basis to optimize spending; (4) launch a "shopping wizard" in a timely manner before the holiday shopping season; (5) "properly manage" digital advertising; and (6) provide accurate information on the effectiveness of the advertising spending.[2]  *Id.*

---

[2]  The Court concludes that the counterclaim (Count I) as a whole states a claim for breach of contract. But the Court stops short of holding that each of the individual bullet points is actionable, in and of itself. MBuy makes a few passing arguments that certain parts cannot give rise to a claim, such as the allegation about adjusting advertising on a daily basis.  But MBuy's arguments about individual components of the claim are too cursory.  So, for now, the claim as a whole survives.

Several of the six bullet points offer supporting examples, too. For example, the allegation about digital advertising (bullet #5) states that MBuy did not properly target users on Facebook after they watched clips on YouTube, and did not optimize Amazon advertising. *Id.*

In its motion to dismiss, MBuy seems to fault SCOTTeVEST for paraphrasing the text of the Agreements. MBuy seizes on SCOTTeVEST's use of the phrase "*properly* manage." *See* Counterclaim, at ¶ 10 (Dckt. No. 12) (emphasis added). According to MBuy, "there is *no* provision in the any [sic] of the parties' contracts that mentions or mandates 'proper' management or monitoring." *See* Pls.' Mem. of Law in Support of Mot. to Dismiss Counterclaims, at 9 (Dckt. No. 37) (emphasis in original).

MBuy reads the counterclaim too sharply. SCOTTeVEST is not attempting to inject a new "proper management" standard into the Agreements. Instead, read in the light favorable to the non-movant, the counterclaim alleges that MBuy did not live up to its obligation to perform services to "optimize and analyze your media buys for maximized results." *See* Cplt., at Ex. A, ¶ 1 (Dckt. No. 1); *id.* at Ex. D, ¶ 1. So, a failure to "properly manage" simply means a failure to manage.[3]

MBuy then argues that the word "optimized" is undefined in the Agreements. *See* Pls.' Mem. of Law in Support of Mot. to Dismiss Counterclaims, at 9 (Dckt. No. 37). According to MBuy, there are "no objective qualitative benchmarks of *any* kind" about "what qualifies as an 'optimized' campaign." *Id.* (emphasis in original). So without a measuring stick, there can be no breach.

---

[3] MBuy challenges the adverb ("properly") but not the verb ("manage"). MBuy does not argue that it had no duty to manage. The Court notes that the Agreements gave SCOTTeVEST access to MBuy's "proprietary Managed Media Services & Technology Platform." *See* Cplt., at Ex. A, ¶ 4 (Dckt. No. 1, at 11 of 44); *id.* at Ex. D, ¶ 4 (Dckt. No. 1, at 36 of 44).

It is true that the Agreements do not define what it means to "optimize" the media buys. But that's not a reason to dismiss the counterclaim. Under Illinois law, words in a contract have their natural meaning if the parties did not agree on a definition. *See, e.g.*, *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) ("Under Illinois law . . . contract terms are interpreted according to their plain meaning unless otherwise defined.") (citing *Trade Center v. Dominick's Finer Foods*, 304 Ill. App. 3d 931, 238 Ill. Dec. 230, 711 N.E.2d 333, 335 (1st Dist. 1999)). The ordinary meaning of words is the default rule. Words mean what they usually mean, unless there is a good reason to think otherwise.

The parties can address what "optimize" means at a later time. If need be, the parties can resort to dictionaries, or present evidence about what it means in the industry (if it is a term of art). But at this point, there is no reason to think that the parties are so lost at sea about the meaning of "optimize" that the word is, in effect, meaningless.

If the meaning of "optimize" is such a mystery, one wonders why MBuy used that word in its contracts in the first place. After all, MBuy apparently drafted the agreements. Courts do not favor interpretations of a contract that render terms meaningless. *See Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 267 (7th Cir. 2016), as amended (Jan. 25, 2017); *Elda Arnhold & Byzantio, LLC v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 705 (7th Cir. 2002) ("Illinois courts construe contract terms 'so as to avoid rendering other terms redundant or meaningless.'") (quotations omitted). And as the drafter, presumably MBuy had some understanding about the meaning of the words that it used.

It is especially difficult to think that the word is meaningless when it appears not once, not twice, but three times in each agreement. *See* Cplt., at Ex. A, ¶ 1 (Dckt. No. 1) ("To optimize and analyze your media buys . . . ."); *id.* at ¶ 4 ("optimized media negotiation and buying

services"); *id.* at ¶ 5 ("In order to receive actionable and optimized media plans and rate preparations from MBuy . . . ."); *see also* Cplt., at Ex. D, ¶¶ 1, 4, 5 (same). And "optimize" immediately appeared after the sentence saying that the "purpose of this agreement is to clearly establish the roles and responsibilities of the parties." *Id.* at Exs. A, D. It was the very first verb, in the very next sentence. *Id.* It is hard to believe that the parties used a meaningless word three times, right after declaring that the purpose of the contract was a "clear[]" understanding of their roles. *Id.*

MBuy also used the word "optimize" in its own complaint. On page one. "MBuy works with its clients, prospective advertisers, to plan, evaluate and *optimize* media purchases across the spectrum of platforms and channels, including television, radio, print, digital and social media." *See* Cplt., at ¶ 2 (Dckt. No. 1) (emphasis added). Surely MBuy thought that the word "optimize" meant something when it represented to the Court that it is in the business of optimizing advertising.

MBuy then argues that it was not a "guarantor" of the success of the advertising campaign. *See* Pls.' Mem. of Law in Support of Mot. to Dismiss Counterclaims, at 1 (Dckt. No. 37). It is true that the Agreements did not guarantee outcomes. MBuy did not promise that the advertising would be effective. Poor sales, without more, are not a basis for a claim.

But SCOTTeVEST is not claiming that MBuy guaranteed that the advertising would generate sales. Instead, SCOTTeVEST is claiming that MBuy fell down on its job to provide knowledge and expertise. That obligation comes straight from the text of the contracts. MBuy agreed to leverage its "proprietary tools, technology, processes, and expertise to perform single source market analysis, negotiation(s), rate preparations and media purchases." *See* Cplt., at Exs.

A, D (Dckt. No. 1). MBuy agreed to provide those services "[t]o optimize and analyze your media buys for maximized results." *Id.*

The counterclaim plausibly alleges that MBuy agreed to provide expertise about SCOTTeVEST's advertising efforts, and that MBuy failed to perform. The counterclaim alleges a duty and breach, and thus states a claim.

MBuy also points to the Terms and Conditions, especially the disclaimer of warranties. *See* Pls.' Mem. of Law in Support of Mot. to Dismiss Counterclaims, at 9–10 (Dckt. No. 37). But that disclaimer does not preclude a claim for breach of contract. A party can breach a contract without breaching a warranty. Here, SCOTTeVEST isn't claiming that MBuy breached a warranty. Instead, SCOTTeVEST alleges that MBuy failed to provide the expert services required by the Agreements.

MBuy makes one last argument. The counterclaim alleges that MBuy failed to provide "accurate information on the effectiveness of SCOTTeVEST's advertising expenditures." *See* Counterclaim, at ¶ 10 (Dckt. No. 12). According to MBuy, the Terms and Conditions create a framework for how the parties were supposed to address inaccurate reports. *See* Pls.' Mem. of Law in Support of Mot. to Dismiss Counterclaims, at 10 (Dckt. No. 37). The Terms and Conditions required SCOTTeVEST to give notice to MBuy and an opportunity to cure. *Id.* And the counterclaim never alleges whether SCOTTeVEST notified MBuy about the inaccurate reports. *Id.*

MBuy's argument will have to wait. The counterclaim does not address whether SCOTTeVEST notified MBuy about the inaccurate reports. If the Agreements required notice and an opportunity to cure, and if SCOTTeVEST failed to satisfy that requirement, then MBuy

can make that argument later. But it depends on the facts. For now, the counterclaim alleges enough to state a claim.

In sum, SCOTTeVEST has come forward with a plausible reading of the Agreements, and alleged facts that MBuy breached its contractual obligation to provide a certain level of services. The motion to dismiss the breach of contract counterclaim is denied.

## II.    Negligent Misrepresentation

SCOTTeVEST also brings a counterclaim for negligent misrepresentation. *See* Counterclaim, at ¶¶ 19–25 (Dckt. No. 12). The parties engage in a long back-and-forth about whether the counterclaim satisfied the particularity requirements of Rule 9(b). Both parties miss a glaring problem – heightened pleading requirements don't apply to negligence claims at all.

Illinois law recognizes different types of misrepresentation claims. Negligent misrepresentation involves "carelessness or negligence in ascertaining the truth of the statement by the party making it." *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 300 Ill. Dec. 69, 843 N.E.2d 327, 334–35 (2006); *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833–34 (7th Cir. 2007). But fraudulent misrepresentation involves a statement that is "known or believed to be false by the party making the statement." *Europlast, Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266, 1272 (7th Cir. 1993) (citing *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 37 Ill. Dec. 597, 402 N.E.2d 599, 601 (1980)); *Newman v. Metropolitan Life Ins. Co.*, 885 F.3d 992, 1003 (7th Cir. 2018). Negligence is about carelessness, and fraud is about intent. That is, negligence involves conduct, and fraud involves conduct plus intent. *See* Dan B. Dobbs *et al.*, The Law of Torts § 31 (2d ed. 2011) ("Intent and negligence are entirely different concepts. Negligence entails unreasonably risky conduct; the emphasis is on risk as it would be perceived by a reasonable person, not on the

13

defendant's purpose or on the certainty required to show intent.").  "[N]egligence does not require a state of mind at all but focuses instead on outward conduct."  *Id.*

Different pleading standards apply to the two different claims.  Rule 9(b) raises the bar for pleading fraud.  A party alleging fraud "must state with particularity the circumstances constituting fraud."  *See* Fed. R. Civ. P. 9(b).  A party can allege "intent" generally, but must describe the "circumstances" of the fraud in detail.  *Id.*

Rule 9(b) applies to fraud, but negligence is not fraud.  *See Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 916 (D.C. Cir. 2015) ("[I]ntent and negligence are regarded as mutually exclusive grounds for liability."); Dan B. Dobbs *et al.*, The Law of Torts § 31 (2d ed. 2011) ("Any given act may be intentional or it may be negligent, but it cannot be both.").  A negligent misrepresentation claim "is *not* governed by the heightened pleading standard of Rule 9(b)."  *Tricontinental Indus.*, 475 F.3d at 833 (emphasis in original).

SCOTTeVEST purports to bring a counterclaim for negligent misrepresentation, not fraudulent misrepresentation.  *See* Counterclaim, at ¶¶ 19–25 (Dckt. No. 12).  If the claim sounded in negligence, Rule 9(b) would not apply.  But in reality, SCOTTeVEST alleges intent to deceive, not carelessness.  So SCOTTeVEST is, in fact, alleging fraud, even though it called the claim something else.  The facts alleged don't match the title of the claim.

For example, SCOTTeVEST alleges that "MBuy repeatedly made material misrepresentations about the effectiveness of advertising campaigns in order to give the appearance of greater effectiveness."  *Id.* at ¶ 12 (emphasis added).  MBuy provided "false" information about the return on advertising spending and the revenue attributable to different types of advertising.  *Id.*  According to SCOTTeVEST, "MBuy reached this false calculation by overstating and misattributing revenue across advertising platforms, and selectively choosing the

costs it included, which specifically excluded the costs of television advertising and Quirk's creative services." *Id.* SCOTTeVEST's allegation is that MBuy "selectively" manipulated the reports, which is an allegation of intent rather than mere carelessness. *Id.* It gave a "false calculation" to give a "false" "appearance." *Id.*

SCOTTeVEST's answer reinforces the point, stating that MBuy made "intentional and false representations" to induce the contract. *See* Answer, at ¶ 24 (Dckt. No. 12). And in its response brief, SCOTTeVEST argues that it "alleged fraud with particularity." *See* Def.'s Response in Opposition, at 9 (Dckt. No. 38).

Substance, not labels, is what matters. *See* 5 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1286 (3d ed. 2004) ("[A] pleading will be judged by the quality of its substance rather than according to its form or label . . . ."). So the Court will treat the counterclaim for what it is – a claim for *fraudulent* misrepresentation – even though the claimant called it something else. *See Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) ("Rule 9(b) applies to 'averments of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiffs' factual allegations."); *Rosenstern v. Allergan, Inc.*, 987 F. Supp. 2d 795, 805–06 (N.D. Ill. 2013) (construing a claim captioned "negligent misrepresentation" as a claim for fraudulent misrepresentation based on the substance of the allegations).

The misrepresentation counterclaim "sounds in fraud," so it is subject to the heightened pleading standard of Rule 9(b). *See id.* at 806. The counterclaim falls far short of the heightened pleading requirements for fraud. "Rule 9(b) requires that facts such as 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff' be alleged in detail."

15

*Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (quoting *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)). Pleading with particularity means the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *see also* 5A Arthur R. Miller *et al.*, *Fed. Prac. & Proc. Civ.* § 1297 (3d ed. 2004) (4th ed. 2020).

SCOTTeVEST does not tell a story of fraud with any specificity. The few allegations about misrepresentations hover at a high level of generality. "MBuy repeatedly made material misrepresentations about the effectiveness of advertising campaigns." *See* Counterclaim, at ¶ 12 (Dckt. No. 12). SCOTTeVEST refers generally to "false representations" in Dashboard and monthly reports about revenue and the return on spending, leaving the reader uninformed about who said what when. *Id.* at ¶ 13. SCOTTeVEST does not reveal who made the statements, or what they said, or when, or how the communications took place. It alleges misrepresentations about a general topic, without much more. That is not enough.

Count II fails to allege fraud with specificity. SCOTTeVEST's negligent misrepresentation claim, which the Court construes as a fraudulent misrepresentation claim, is dismissed.

## III. Breach of Fiduciary Duty

Count III is a breach of fiduciary duty claim. *See* Counterclaim, at ¶¶ 26–29 (Dckt. No. 12). SCOTTeVEST alleges that MBuy owed a fiduciary duty because of a "disparity in the parties' expertise and sophistication," which caused SCOTTeVEST to place "trust and confidence" in MBuy. *See* Counterclaim, at ¶ 27 (Dckt. No. 12). That is not enough. MBuy was SCOTTeVEST's service provider, not its fiduciary.

16

"Fiduciary duties arise as a matter of law, not contract." *See Kovac v. Barron*, 2014 IL App (2d) 121100, ¶ 63, 6 N.E.3d 819, 832; *see also Pope v. Smith-Rothchild Fin. Co.*, 2003 WL 22889377, at *3 (N.D. Ill. 2003). "The common law imposes that duty when the disparity between the parties in knowledge or power relevant to the performance of an undertaking is so vast that it is a reasonable inference that had the parties in advance negotiated expressly over the issue they would have agreed that the agent owed the principal the high duty we have described, because otherwise the principal would be placing himself at the agent's mercy." *See Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992), *as amended on denial of reh'g* (May 1, 1992). Examples include the relationship between an attorney and a client, or a guardian and a child. *Id.* The "fiduciary principle is designed to prevent that trust from being misplaced." *Id.*

Under Illinois law, fiduciary duties arise from a specific, legally recognized relationship between the parties or from "special circumstances." *See Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748–49 (7th Cir. 2006). "To determine if special circumstances exist, courts consider the degree of kinship between the parties; the disparity in age, health, mental condition, education, and business experience between the parties; and the extent to which the servient party entrusted his business affairs to the dominant party and placed trust and confidence in it." *Id.* at 749. The fact that only "special" circumstances can give rise to a fiduciary duty underscores that it is the exception, not the rule. The party alleging a fiduciary relationship must establish its existence by clear and convincing evidence. *See Green Dolphin Capital LLC v. JPMorgan Chase Bank, N.A.*, 2020 WL 5545700, at *5 (N.D. Ill. 2020) (citing *Magna Bank of Madison Cty. v. Jameson*, 604 N.E.2d 541, 544 (Ill. App. Ct. 1992)).

"Parties to a contract are not each other's fiduciaries." *Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992). Courts

routinely reject fiduciary duty claims when both parties are sophisticated commercial entities who entered into a contract. *See, e.g., Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*, 2019 WL 4735459, at \*14 (N.D. Ill. 2019) (rejecting a fiduciary duty claim where both parties had "years of experience in the industry" and the plaintiff maintained "an active role" in the business relationship); *Loggerhead Tools, LLC v. Sears Holdings Corp.*, 2016 WL 5111573, at \*4 (N.D. Ill. 2016) (finding no fiduciary relationship when plaintiff was "a sophisticated business man" with "years of business experience"); *Shuffle Tech Int'l LLC v. Wolff Gaming, Inc.*, 950 F. Supp. 2d 977, 983 (N.D. Ill. 2013) (holding that the parties' "unremarkable contractual terms fall far short of the kind of evidence required to establish the existence of a fiduciary relationship"); *Merix Pharm. Corp. v. Clinical Supplies Mgmt., Inc.*, 2012 WL 1577676, at \*7 (N.D. Ill. 2012) ("Nothing that Merix alleges, however, suggests that it and CSM were anything other than parties to a contract that was bargained for at arm's-length. The clinical trial was important to Merix, but that alone does not create a fiduciary relationship."); *Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 694 (7th Cir. 2008); *Benson v. Stafford*, 941 N.E.2d 386, 397–98 (Ill. App. Ct. 2010) ("The mere fact that the parties have engaged in business transactions or have a contractual relationship is not itself sufficient to establish a fiduciary relationship.").

SCOTTeVEST argues that this case involves "special circumstances" because MBuy had greater "expertise and sophistication" when it came to advertising. *See* Counterclaim, at ¶ 27 (Dckt. No. 12). A mere disparity in sophistication or expertise, without more, is not enough to give rise to a fiduciary duty. "We have emphasized knowledge and expertise but we do not mean to suggest that every expert is automatically a fiduciary. That is not the law in Illinois or anywhere else." *Burdett*, 957 F.2d at 1381; *see also KFC Corp. v. Iron Horse of Metairie Rd., LLC*, 2020 WL 3892989, at \*10 (N.D. Ill. 2020).

18

Lots of contracts involve disparities in sophistication and expertise. That's one of the reasons why parties enter into contracts in the first place – to benefit from someone else's greater knowledge or skills. *See Peterson v. H & R Block Tax Servs., Inc.*, 971 F. Supp. 1204, 1215 (N.D. Ill. 1997) ("[N]o case in Illinois or anywhere else holds that every expert is *ipso facto* a fiduciary. If this were so, every business that specializes in a particular type of service would be the fiduciary of its customers."). A contract to benefit from someone else's expertise, without more, is not enough to give rise to a fiduciary relationship.

If anything, the cases cited by SCOTTeVEST confirm that this case does not fit the mold. In *Burdett*, a wealth manager owed a fiduciary duty to the client given the "relation of trust with [plaintiff] over a period of years, holding himself out as an expert in a field (investments) in which she was inexperienced and unsophisticated." *Burdett*, 957 F.2d at 1381. Moreover, the wealth manager "knew that [the client] took his advice uncritically and unquestioningly and that she sought no 'second opinion' or even—until the end, when at last her suspicions were aroused—any documentary confirmation of the investments to which he steered her." *Id.* Another Seventh Circuit decision concluded that there was no fiduciary relationship between a beneficiary of a land trust and a bank. *See Pommier v. People Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992). "The essence of a fiduciary relationship is that one party is dominated by the other. The fact that one party trusts the other is insufficient." *Id.* (citation omitted); *see also Ret. Plan for Chicago Transit Auth. Employees v. Chicago Transit Auth.*, 2020 IL App (1st) 182510, ¶ 61 ("But, absent dominance or control by one party, reliance alone does not create a fiduciary relationship.").

The relationship between SCOTTeVEST and MBuy is not remotely comparable to a fiduciary relationship. *See Pommier*, 967 F.2d at 1119 ("We are to look to factors such as:

kinship, age disparity, health, mental condition, education, business experience, and the extent of reliance."). SCOTTeVEST was not in a helpless, subservient position, dominated by MBuy and protected only by trust. If anything, SCOTTeVEST depicts itself as a sophisticated entity that selected MBuy for a commercial relationship covering a multi-million-dollar national advertising campaign. *See* Counterclaim, at ¶ 3 (Dckt. No. 12) (describing SCOTTeVEST's "search for parties to improve its branding and better manage its advertising," and discussions "with numerous creative agencies"). And even then, SCOTTeVEST retained power and control – it retained approval rights for advertising buys and entered into a contract that allowed it to monitor spending. *See* Answer, at ¶¶ 8–10, 30–31 (Dckt. No. 12); *see also* Cplt., at Ex. A (Dckt. No. 1, at 11 of 44) ("Advertiser agrees to work in concert with the MBuy team to clearly communicate advertising campaign goals, key performance indicators, vender selection, and overall marketing objectives."); *id.* at Ex. D (Dckt. No. 1, at 36 of 44) (same).

Reading the facts in a light favorable to SCOTTeVEST, the allegations of the counterclaim do not state a claim that MBuy and SCOTTeVEST had a fiduciary relationship. The Court therefore grants MBuy's motion to dismiss SCOTTeVEST's counterclaim for breach of fiduciary duty.

## IV. Conversion

SCOTTeVEST's last remaining counterclaim is a claim for conversion. *See* Counterclaim, at ¶¶ 36–39 (Dckt. No. 12). The gist of the claim is that MBuy has refused to return certain social media accounts to SCOTTeVEST's control.

To prove conversion in Illinois, a plaintiff must establish that "(1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without

20

authorization assumed control, dominion, or ownership over the property." *Cirricione v. Johnson,* 184 Ill. 2d 109, 234 Ill. Dec. 455, 703 N.E.2d 67, 70 (1998).

Critical to SCOTTeVEST's claim here is the notion that conversion extends to intangible property under Illinois law. SCOTTeVEST appears to concede that its social media accounts and associated data constitute intangible property. *See* Def.'s Response in Opposition, at 13–15 (Dckt. No. 38). But SCOTTeVEST argues that Illinois law is unclear about whether conversion applies to intangible property, citing *DirecTV, Inc. v. Castillo*, 2004 WL 783066, at *2 (N.D. Ill. 2004) (discussing *In re Thebus*, 108 Ill. 2d 255, 91 Ill. Dec. 623, 483 N.E.2d 1258 (Ill. 1985) and *Stathis v. Geldermann, Inc.*, 295 Ill. App. 3d 844, 229 Ill. Dec. 809, 692 N.E.2d 798 (1st Dist. 1998)). SCOTTeVEST then points to courts in other states, including New York, Minnesota, Arkansas, Ohio, and Nevada, that allegedly recognized claims for conversion based on rights in intangible property.

The Seventh Circuit has addressed whether Illinois law recognizes a claim for conversion of intangible property. *See American National Insurance Co. v. Citibank, N.A.*, 543 F.3d 907, 910 (7th Cir. 2008). Simply put, "Illinois courts do not recognize an action for conversion of intangible rights." *Id.* Instead, claims for conversion of intangible rights are cognizable only if the rights are "connected with something tangible . . . such as promissory notes, bonds, bills of exchange, share certificates, and warehouse receipts." *Joe Hand Promotions, Inc. v. Lynch*, 822 F. Supp. 2d 803, 808 (N.D. Ill. 2011) (citing *The Film and Tape Works, Inc. v. Junetwenty Films, Inc.*, 368 Ill. App. 3d 462, 305 Ill. Dec. 807, 856 N.E.2d 612, 624 (1st Dist. 2006)) (quotation marks omitted). Courts in this district continue to reject conversion claims about intangible property. *See, e.g.*, *FW Assocs. LLC v. WM Assocs. LLC*, 2019 WL 354953, at *4 (N.D. Ill. 2019).

21

SCOTTeVEST has not come forward with any authority from Illinois courts recognizing a conversion claim for intangible property. As the law stands, intangible property (standing alone) cannot give rise to a conversion claim. Count V is therefore dismissed.

### Conclusion

For the reasons above, MBuy's Motion to Dismiss SCOTTeVEST's Counterclaims is denied as to Count I and granted as to Counts II–V.


Date:   November 20, 2020

_____

Steven C. Seeger
United States District Judge